No. 19,269.

ALICE Q. McBETH, *Appellee,* v. THE ATCHISON, TO-
PEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. DAMAGES — *Railroad Crossing — Negligence Found — Not
Charged in Petition.* Where the negligence found by the
jury is not the negligence charged in the petition nor fairly
to be inferred therefrom, the defendant is ordinarily entitled
to judgment.

2. SAME. Where through some unknown cause an automobile
engine stopped on a railway crossing in the open country
and a heavy passenger train was speeding towards the cross-
ing at fifty-five miles an hour from a point in plain view half
a mile away, and the occupants of the car stepped out and
began to apply themselves in seeking to crank the car and to
push it from the track, and where the engineer of the train
applied the emergency brakes as soon as he had a chance to
discover that the car was stalled on the track, but the train
was not stopped in time to prevent a collision, the railway
company can not be held to have been negligent nor liable·
in damages for the value of the car.

Appeal from Finney district court; GEORGE J.
DOWNER, judge. Opinion filed May 8, 1915. Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,*
all of Topeka, and *William Osmond,* of Great Bend,
for the appellant.

*R. W. Hoskinson,* and *Albert Hoskinson,* both of
Garden City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This is an appeal by the Santa Fe
railway from a judgment awarding damages against it
for the destruction of an automobile at a railway cross-
ing in Chase county.

The plaintiff, who owned the automobile, was jour-
neying in it with three friends from Garden City to
Kansas City. Her car stopped on the crossing, some-

thing being the matter with the engine. A Santa Fe passenger train in plain view half a mile away was speeding towards the crossing at fifty-five miles an hour at the time the automobile stopped on the track.

Plaintiff's petition, in part, reads:

"When the automobile of plaintiff was upon the track of defendant the engine of said automobile became dead and the same could not be run off said track; that the driver and one other man who was in said automobile at the time of going on said railroad track were unable to start said automobile or to push the same off of the defendant's railroad track; that while the said automobile of plaintiff was on defendant's railroad track she noticed that defendant's train was approaching very rapidly and that before plaintiff's driver and other members of the party were able to remove said automobile, said approaching train struck said automobile breaking and entirely demolishing the said automobile. . . . Plaintiff further states that defendant was running its train at a very high rate of speed; that it had ample time to have stopped its train after its servants and employees could have seen plaintiff's automobile on its track had the servants and employees of defendant used all the available facilities upon said train for said purposes, and thereby saved plaintiff from any injury or damages, but that said defendant neglected to use said appliances or to make any effort to prevent said train from running into and colliding with plaintiff's automobile."

Plaintiff's nephew, who drove the car, testified in her behalf, in part, as follows:

"After the engine died I saw the train. It was probably coming out of Cedar Point—a passenger train. They said it was No. 1. (It was admitted by counsel that this was defendant's passenger train No. 1.) When we saw the train coming I got out and cranked the engine. It would not go, and I told the occupants of the car to get out and I tried to crank it again, but I could not, and I got up in the engine and waved and signalled with my cap. Then Mr. Freeland and I tried to roll the car from the track but we could n't move it. We pushed against the wheel and radiator and fenders, both. Then we tried to back it

up. I signalled the train again and tried again to push the car off, then I ran down the track towards the train. I ran down the track twenty or thirty yards, perhaps. I don't know exactly. I would say the train was half a mile or more away when I first saw it. That was after my car had stopped, that I first saw the train."

Plaintiff's nephew further testified:

"I can't remember what I did to any of the instruments for regulating the speed of the car, except that before I came onto the crossing I changed from high to intermediate speed. I did n't stop the car with the brake. I did n't do anything that would stop it. There is simply no cause that I know of why that car stopped on the track. I have no theory as to why it did stop. I would judge Cedar Point to be about a mile from the crossing. May be not quite so far. I should say the engine was about half a mile from us when I first saw it. The first thing I did was to get out and try to crank it. I did n't know why it did n't crank. The car was not in the habit of refusing to crank. . . . The car was not ordinarily a difficult one to move on level ground. It would make some difference about it if the brakes were on. The car was thrown on the north side of the track. . . . I don't think our engine went dead just as the wheels struck the first track. I don't think two men could readily have pushed that car off if the brakes had n't been set. If the wheels were against the rails and the rails were pretty well above the ground it would be pretty hard to roll the car off. I think the rails were protruding above the ground. I could not say to what extent; I don't know exactly."

At the conclusion of plaintiff's evidence defendant interposed a demurrer, which was overruled. Thereupon the defendant placed its engineer on the stand, who testified in part:

"My engine is one of the biggest in the passenger service. We were due at Cedar Point that day at 4:32. I think we were between five and seven minutes late. We were going just as fast as we could, I judge at fifty-five miles an hour. We had ten cars—two baggage cars and eight coaches. As we approached Cedar Point I

whistled at the station board half a mile east of Cedar Point. The bell rang until we passed the station of Cedar Point, and after we left the station I shut the ringer off. It is an automatic ringer. There is a crossing board there for the crossing west of Cedar Point. We whistled for that crossing, and I proceeded about three or four hundred feet and noticed an automobile on the track. They was getting on and I immediately whistled and gave warning I was coming, and it seemed they did n't move then, so I turned the emergency brake on. Immediately I saw they were stuck on the track I applied the emergency brake. That caused the power that we have to be shut off and it stopped the train. I did not succeed in stopping the train before I reached the automobile. I could not have done anything more to stop the train. A train going sixty miles an hour would be going about eighty-eight feet a second, and if going fifty-five miles an hour it would be about one-twelfth less. When we actually hit the automobile I would judge we had slowed down to ten or twelve miles an hour. . . . Our regular schedule time for No. 1 was about fifty-five miles an hour at that point. This was one of the latest engines at that time. Taking an engine of that kind, pulling a train of ten cars, at a rate of fifty-five miles an hour, I don't believe we could stop that train at less than between twelve or fifteen hundred feet. It would depend on the condition of the track. Twelve hundred feet would be a very quick stop I think under those circumstances. . . . I did n't see the automobile as it came upon the track. Something must have drawed my attention at the moment, but I seen it before I got to the crossing post. I saw it right there, and the men was around it. As soon as I saw the men were around it, I whistled and put on the emergency brake."

Defendant's fireman testified:

"I saw an automobile come up on the crossing and stop. . . . As soon as the automobile came onto the track we started the whistles and sounded the consecutive whistles. The engineer applied the emergency brakes—air brakes. It took him just an instant to do that. I should judge we ran close to twelve hundred feet after those air brakes were applied. I saw the parties at the crossing. The front wheels of the automobile were past about the center of the track. They

were on the track. I did n't see the occupants of the automobile get out; I don't just recall how they got out, but they were getting out. There was nothing that Mr. Dix could have done to stop that train that he did n't do. After he saw the car was stuck, there was nothing could have been done to have avoided it. . . . We could see that automobile probably half a mile that day."

Defendant's section foreman testified:

"There is a floor of four planks in each crossing between the rails. All filled in with crushed ballast between the planks. Planks set solid up to about the top of the rails, level with the rails, then filled with crushed ballast. That was the condition of that crossing about the 30th of September, 1911."

The jury found a verdict for plaintiff and made certain findings of fact:

"1. If you find that defendant was negligent, state fully wherein such negligence consisted. Ans. First, in condition of crossing as shown in plaintiff's 'Exhibit B.' Second, because of neglect of duty on the part of the engineer by not observing the track.

"2. What caused the plaintiff's automobile to go dead on defendant's track? Ans. Cause unknown.

"3. Did the engineer of the defendant, as soon as he discovered that plaintiff's automobile was dead on the track, do everything in his power to bring his train to a stop? Ans. No.

"4. If you answer the last preceding question 'No,' state what more he could have done. Ans. Reversed his engine."

"Exhibit B" was a photograph of the crossing taken some months after the wrecking of the automobile. It does not clearly show the planking of the crossing. Without other testimony, it was probably intended that the jury should infer from the exhibit that the crossing was defective, and thus account for the stopping of the automobile.

Under its assignment of errors, the defendant contends: (1) That plaintiff failed to prove the negligence alleged in her petition. (2) That the special

findings of the jury are contrary to the evidence and not supported by the evidence. (3) Error in instructions.

Touching these in order, it will be noted that the negligence alleged in the petition was that defendant failed to stop its train, although it had ample time to do so, thereby wrecking the automobile. Nothing was alleged as to the condition of the crossing which might have caused the automobile to stop on the track. The driver of the car did not know what caused it to stop. If the crossing had been defective, that would not have prevented the automobile engine from responding to the chauffeur's efforts to start his engine. The train was moving at fifty-five miles per hour. Only a trifle over half a minute would elapse after the automobile stopped before the train half a mile away would be upon it. The car was carried forward and flung to one side of the track about forty feet beyond the crossing. When the train stopped the baggage car was opposite the wrecked automobile. Under these circumstances, we see no negligence in not stopping the train sooner. The situation might be different if passengers in the automobile were in danger. In that case it might have been necessary for the engineer more summarily to have stopped his train even at the defendant's damage to its own rolling stock in doing so. But we know of no principle of law which would require the defendant, running its train at legitimate speed in the open country, to stop it so abruptly as to seriously injure its own property to avoid the destruction of the plaintiff's property. We need hardly mention the defendant's duty not to stop its train so suddenly as to injure or imperil the passengers on the train.

There is merit, we think, in the appellant's contention that the findings of the jury are not supported by the evidence. The first answer to the first finding is not responsive to the pleading. The second answer to

24—95 KAN.

the first question assumes that it was negligence on the part of the engineer not to keep his eye on the track constantly. The engineer has other duties besides observing the track, and the duty of observing the track may be assigned to the fireman. In this case the engineer says he might have had his attention drawn away from the track at the moment the automobile stopped on the track, but the fireman saw it. The enginemen would not be expected to assume, at the very first instant of observation, that the automobile would stop on the track or that something was the matter with it so that it could not be cranked and driven or pushed off the track.

The third finding of fact seems to us to be clearly contrary to the evidence. Moreover, if the enginemen's testimony be disregarded or disbelieved there is then no evidence on which to base that finding. "Everything in his power" might include such a summary stop as to injure the defendant's rolling stock or even to imperil his passengers. However, we treat the question as dealing only with "everything proper."

The fourth finding is not supported by any evidence. Counsel for appellant suggest that the jury must have drawn on their own general knowledge of the way railway engines were operated to make emergency stops a generation ago, before the era of emergency air brakes.

In view of all this, what disposition should be made of this case? It is not necessary to examine the instructions of which appellant complains. The negligence complained of in the petition was not established by the proof. The negligence found by the jury was not that of which the plaintiff complained, nor in accord with the evidence. In *Railway Co. v. Roth*, 80 Kan. 752, 104 Pac. 875, a situation somewhat similar was disposed of by reversing the case and granting a new trial. But in that case the general verdict was inconsistent with the special findings.

The State v. Killion.

In *Cole v. Railway Co.*, 92 Kan. 132, 139 Pac. 1177, a new trial was allowed on reversal where special findings were inconsistent with each other and with the general verdict.

In *Adams v. Railway Co.*, 93 Kan. 475, 481, 144 Pac. 999, the special findings were consistent with themselves although inconsistent with the general verdict, but because the special findings acquitted the defendant of the negligence charged against it, the cause was reversed and remanded with directions to enter judgment for the defendant on the findings of fact. In this case, since the negligence pleaded was not established, and the negligence found in the special findings was not based on the pleadings nor established by the proof, the judgment must be reversed and the cause remanded with instructions to enter judgment for the defendant, and it is so ordered.