*Northern District*
#3978
**BETTY J. HAROUTUNIAN**
v.
**BOSTON AND MAINE CORPORATION**

Argued: April 10, 1968   Decided: July 31, 1968
*Present:*   Brooks, P.J., Yesley, Durkin, JJ.

Case tried to *Connolly, J.* in the Second District Court Eastern Middlesex.

*Durkin, J. This is an action of tort* brought by the owner of a motor vehicle, seeking recovery for the damage to the vehicle resulting from alleged negligence of the defendant's agent in operating a railroad train at a grade crossing in Waltham. The case is here on a report following a finding for the plaintiff. The defendant claims to be aggrieved by the action of the judge in denying the defendant's requests for rulings numbered 2, 3 and 4. Requests numbers 2 and 3, in particular, raise the question of the sufficiency of the evidence to warrant a finding of negligence.

A summary of the evidence shows that about 7:45 P.M. on May 2, 1965, a Budd car owned by the defendant and operated by the defendant's engineer was proceeeding in a westerly direction approaching the Clematis Brook crossing in Waltham. There was a long wide curve of track and then about 150 yards of straight track to the point of the accident, but the engineer could not observe the right side of the crossing at this distance. When the engineer was about 150 yards from the crossing, he saw the rear end of the plaintiff's vehicle on the right hand rail of the west bound track. He immediately applied the emergency brakes and blew the whistle twice. The plaintiff testified that she did not know or why her car was in the area of the accident; that her car was parked in her driveway; that it had been taken

from her driveway that day and the police notified of that fact; and that the plaintiff's vehicle was struck by the right side of the Budd car.

The speed limit of trains at this crossing is 70 miles per hour by rule of the defendant company. The engineer testified that the train could be stopped in 250 to 300 yards after the brakes were applied in emergency conditions such as existed at the time of the accident.

There were automatic gates on each side of the tracks with stopped the flow of automobile traffic when the gates were down. The left gate was down and red lights were flashing at the time of the accident, and 95% of the plaintiff's automobile was north of the rails; no one was in the car at the time of the accident; and the car had been left between the gates on the north side of the west bound track prior to the accident facing in a northerly direction.

The plaintiff introduced into evidence the defendant's answers to the plaintiff's interrogatories No. 4 that the accident occurred when the engineer saw the motor vehicle on the track and applied the brakes and could not stop before striking the rear end of the vehicle; No. 6(a) that the train was going 55 miles per hour at the exact point of the alleged accident; No. 6(b) that the train was going 60 miles per hour when it was about 100 feet from the alleged accident; No. 6(c) that the train was going 65 miles per hour when it was about 200

feet from the point of the alleged accident; No. 9 that the engineer was about 450 feet from the point of the accident when he first saw the plaintiff's vehicle; and No. 10 that the train was 600 feet from the point of the accident when it first came to a stop. The defendant's engineer testified in accordance with the answers to the interrogatories.

The engineer described the two braking systems on the train and testified that "When you take your foot off the dead man's pedal, the brakes go on . . . . It's much quicker to take your foot off the dead man's pedal . . . ." that he took his foot off the pedal because he thought this would be the fastest way to stop the train.

The only evidence as to the happening of the accident came from the engineer of the train who testified that in his opinion the brakes were functioning properly on the Budd liner; that the I.C.C. brake test was done at the North Station before the trip, that he himself had made a running test of the brakes within two hundred yards of the time he had started from the North Station and that there were several slow downs and a stop at Porter Square, Cambridge (prior to the accident), all of which indicated to him that the brakes worked properly; that for a distance of two miles east of the grade crossing he did not observe the brake pressure gauges; that he had no reason to believe that the brakes of the train were not functioning properly; that when he saw that the

train was going to hit the automobile he took his foot off the dead man's pedal, left the cab and sat in the front seat of the train; that the train had no operator during a distance of about 100 to 150 feet prior to the impact, but that he knew the brakes were functioning properly at this time from the noise and that the distance in which the Budd liner came to a stop indicated to him that the brakes were functioning properly.

At the close of the trial and before the final arguments, the defendants made the following requests for rulings:

1. The evidence warrants a finding for the defendant.
2. The evidence does not warrant a finding for the plaintiff.
3. The evidence does not warrant a finding that the defendant was negligent.
4. The evidence does not warrant a finding other than that the accident was caused solely by violation of law on the part of a party for whose conduct the defendant was not responsible.

The court allowed request numbered 1 and denied requests numbered 2, 3 and 4.

We have made careful examination of the report, which is stated to contain all the evidence material to the questions reported, in order to ascertain whether the report shows any basis for the finding for the plaintiff.

1. The speed of the train, 65 mph at about

200 feet before the point of the accident, is not evidence of negligence.

"It has been frequently held that the running of an express train through open country at a rate somewhat similar to that at which the train was travelling in the instant case (60 to 70 m.p.h.) would not alone constitute negligence." *Pooles* v. *B & M RR,* 328 Mass. 165, 168 and cases cited.

*Peterson* v. *B & M RR,* 310 Mass 45, 54.

2. The engineer, at the end of a long curve of track, first saw the rear end of the plaintiff's motor vehicle protruding across the right hand rail of the track when he was about 150 yards from the crossing. He was not required to act on the assumption that he would encounter a motor vehicle stalled or standing upon the tracks. (*Davis* v. *N.Y., N.H. & Hart. RR,* 272 Mass. 217, 222. *Oleskiewicz* v. *B & M RR,* 328 Mass. 180, 105. *Hale* v. *Southern Ry.,* 25 Ala. Apps. 111, 142 So. 587.) This is especially true since he must be held to have had knowledge that at the crossing there were automatic gates on each side of the track; that upon the approach of the train, bells would ring, lights flash and the gates go down. In fact the left gate was down and the red lights were flashing at the time of the accident. He could not be expected to anticipate that an unattended vehicle, or any part of it, was crosswise on the track at the crossing.

3. The engineer described the two braking

systems on the train. He gave his opinion that the removal of the foot from the "dead man's pedal" was the fastest way to stop the train, and he did use this method of bringing the train to a stop. There was no evidence to contradict this testimony, or to indicate that the engineer's judgment in this respect was faulty, or that the removal of his foot from the "dead man's pedal" was other than instantaneous.

4. There is no evidence that the brakes were not functioning properly. The I.C.C. brake test was done at the North Station before the trip; the engineer had made a running test of the breaks within 200 yards of the start; there were several slow-downs and a stop prior to the accident, all of which indicated to the engineer proper functioning of the brakes. The engineer had no reason to believe that there was any brake malfunction, and there was no evidence of such. According to the engineer's testimony, the train could be stopped in 250 to 300 yards; in fact, it came to a stop at a point approximately 1050 feet from the position from which he first saw the motor vehicle. Taking into account the unexpected presence of the motor vehicle on the tracks and reaction time, we can perceive no negligence in the slight difference between the engineer's estimate of stopping distance after application of brakes as soon as he appreciated there was danger and the actual distance travelled. Even if the train could have been brought to a stop 600 feet

sooner, the impact would under these conditions have taken place, with probably the same amount of damage.

5. After applying the brake by the removal of his foot from the pedal, the engineer left the cab and sat in the front seat, and for some distance the train had no operator, but the brakes had already been applied, and the whistle had been sounded. Nothing further could have been done had he remained at his post. This is not a case where some possibility of further preventive action remained. From the first sighting by the engineer of the motor vehicle on the tracks, the collision was inevitable. There was no evidence to show that he failed to do everything to avoid the collision. *Sypher* v. *Director General of Railroads,* 243 Mass. 571.

6. We have been unable to find within the report, by which we are limited, anyone or more acts of negligence, either singly or in combination sufficient to warrant a finding of negligence. To the contrary, the sole responsibility lies with the person who, to the misfortune of the plaintiff, appropriated her vehicle and caused it to be left obstructing the track at the grade crossing; and for this the defendant cannot be held liable. Cases in other jurisdictions, in accord with our decisions, are to be found in *McBeth* v. *Atchison T & F Ry,* 95 Kansas, 364, 148 Pac. 621, and in *Louisville & N.R. Co.* v. *Griffin* 240, Ala. 213, 198 So. 345.

Since defendant's requests numbers 2 and 3

properly challenged the sufficiency of the evidence on the issue of negligence, they should have been allowed. The denial of these two requests was prejudicial error. Since what we have said disposes of the case, it is unnecessary to discuss the point raised by the defendant's request number 4.

In view of the above, the denial of the defendant's requests 2 and 3 was prejudicial error. The finding for the plaintiff is to be vacated, and a **new finding is to be entered for the defendant.**

JOHN A. JOHNSON,
for the plaintiff.
ROBERT D. O'LEARY,
for defendant.